**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

ALE'XAVIER WRIGHT,

Plaintiff,

v. Case No.

BELOIT COLLEGE,

Defendant,

**COMPLAINT AND JURY DEMAND**

Plaintiff Ale'Xavier Wright, by his attorneys, Laster & Associates, LLC, brings this action against Defendant Beloit College and alleges as follows:

## I. NATURE OF THE ACTION

1. This action arises from Beloit College's treatment of Plaintiff Ale'Xavier Wright, then a first-year student and student-athlete at Beloit College, following another student's September 2023 allegation of sexual misconduct against him.
2. Wright entered Beloit as a member of its incoming Class of 2028 and as a participant in its football program. Beloit awarded Wright an Eaton Scholarship valued at $37,000 annually and $148,000 over four years.
3. Beloit maintained a written Policy Against Sexual Harassment and Associated Grievance Procedures governing its response to allegations of sexual misconduct and establishing procedural protections for complainants and respondents.

4. Among other protections, Beloit's Policy provided that a respondent was presumed not responsible for alleged conduct until a determination regarding responsibility was made through the College's grievance process.

5. The Policy further provided that supportive measures were to be non-disciplinary and non-punitive individualized services designed to restore or preserve equal access to Beloit's educational programs without unreasonably burdening the other party.

6. The Policy further provided that, before imposing disciplinary sanctions or other actions against a respondent that were not supportive measures, Beloit would follow its grievance process.

7. Before any determination that Wright had engaged in sexual misconduct, however, Beloit substantially restricted Wright's campus activities, caused him to be relocated from his residence, and suspended or otherwise restricted his participation in the football program.

8. Beloit later asserted that Wright's football suspension was unrelated to the sexual-misconduct allegation and instead resulted from Wright allegedly lying to his coach. Beloit has subsequently represented, however, that it possesses no responsive athletic or disciplinary education records concerning Wright. The contemporaneous documentation supporting Beloit's stated reason for the football suspension, if any, remains in Beloit's possession or control and will be the subject of discovery.

9. As the situation escalated, Beloit's Title IX Coordinator, Cecil Youngblood, communicated with Wright's mother concerning Wright's safety. Wright alleges that Youngblood informed his mother that Beloit could not ensure Wright's safety and advised her to remove Wright from the College and return with him to Florida.

10. Wright left campus with his mother and returned to Florida. Wright did not understand that his safety-related departure constituted a voluntary and permanent withdrawal from Beloit.

11. Beloit nevertheless began treating Wright as withdrawn as of September 12, 2023.

12. Beloit's contemporaneous internal communications demonstrate that College officials understood Wright's departure to be directly connected to the sensitive circumstances confronting him on campus. In discussing the financial consequences of Wright's departure, Beloit personnel proposed documenting that Wright had been involved in a sensitive and confidential situation that "required [him] to withdraw immediately."

13. Youngblood agreed with that characterization, responding that it was "exactly right" and explaining that the situation had become increasingly mentally and physically stressful for Wright and was inhibiting his ability to remain at Beloit.

14. On September 18, 2023, Beloit then relied upon Wright's purported non-enrollment to dismiss the pending sexual-misconduct complaint without reaching any determination as to whether Wright committed the alleged misconduct.

15. The presently available records do not establish that Wright personally requested or authorized a permanent withdrawal from Beloit. The identity of the person or persons who processed or authorized the withdrawal, the mechanism by which the withdrawal was recorded, and the records upon which Beloit relied in treating Wright as voluntarily withdrawn are presently within Beloit's possession and control and will be the subject of discovery.

16. Wright brings this action to recover for the educational, financial, athletic, reputational, and other injuries caused by Beloit's alleged failure to provide the contractual and statutory protections to which he was entitled and by discrimination in connection with Beloit's response to the allegations against him.

## II. PARTIES

17. Plaintiff Ale'Xavier Wright is an adult individual who, at all relevant times, was a student enrolled at Beloit College and a participant in its football program.

18. Defendant Beloit College is a private institution of higher education located in Beloit, Wisconsin.

19. Beloit College receives federal financial assistance and is subject to Title IX of the Education Amendments of 1972.

## III. JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over Wright's federal claims pursuant to 28 U.S.C. § 1331.

21. This Court has supplemental jurisdiction over Wright's related Wisconsin-law claims pursuant to 28 U.S.C. § 1367.

22. Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391 because Beloit College is located within this District and a substantial part of the events giving rise to Wright's claims occurred in Beloit, Wisconsin.

## IV. FACTUAL ALLEGATIONS

### A. Wright's Recruitment, Enrollment, Scholarship, and Football Participation

23. Wright applied to Beloit College for admission for the Fall 2023 semester.

24. Wright's application specifically identified varsity football as an intended activity and identified Beloit football coach Ted Soenksen as a Beloit College contact.

25. Beloit admitted Wright to its Class of 2028 and informed him that it believed he would thrive at the College.

26. Beloit also awarded Wright the Eaton Scholarship, valued at $37,000 annually and $148,000 over four years.

27. Beloit's financial-aid materials further reflected substantial institutional financial assistance associated with Wright's attendance.

28. Wright accepted Beloit's offer, enrolled as a first-year student for the Fall 2023 semester, and participated in Beloit's football program.

29. As an enrolled student, Wright was subject to and entitled to the protections contained in Beloit's policies and procedures, including its Policy Against Sexual Harassment and Associated Grievance Procedures.

30. The Policy established procedures governing reports and formal complaints of sexual harassment and sexual misconduct and identified rights and protections afforded to complainants and respondents.

31. Among those protections was the presumption that a respondent was not responsible for alleged misconduct until responsibility was determined at the conclusion of the grievance process.

32. The Policy further placed upon Beloit the burden of gathering evidence sufficient to reach a determination regarding responsibility.

**B. The September 2023 Allegation**

33. On or about September 2, 2023, another Beloit College student alleged that Wright had engaged in non-consensual sexual activity with her.

34. Wright disputed the allegation.

35. At no time relevant to this Complaint did Beloit make a determination that Wright was responsible for sexual misconduct.

36. Nevertheless, the accusation became known to members of the complainant's family and members of the Beloit community.

**C. The Complainant's Family Comes to Wright's Residence**

37. On or about September 4, 2023, members of the complainant's family came onto Beloit's campus and went to or near Wright's residence hall looking for him.

38. The incident created concerns regarding Wright's safety.

39. Beloit was aware of the incident and of concerns regarding Wright's physical safety.

40. Beloit thereafter directed or caused Wright to be relocated from his existing campus residence.

41. Wright complied with the relocation.

42. Wright's compliance with directives issued by College officials under these circumstances did not constitute an admission of wrongdoing, a voluntary relinquishment of his rights as a student, or consent to punitive treatment.

**D. Beloit Imposes Substantial Restrictions Before Any Finding of Responsibility**

43. During this same period, Youngblood communicated with Wright's football coach concerning restrictions upon Wright's campus activities.

44. Youngblood instructed the coach to tell Wright that he was to go "nowhere but class, dorm, food" and that Wright should not place himself in what College personnel considered "bad positions."

45. Wright complied with the College's directives while the sexual-misconduct allegation remained unresolved.

46. Beloit's Policy permitted the College to implement supportive measures while allegations were pending.

47. The Policy, however, expressly defined supportive measures as non-disciplinary and non-punitive individualized services designed to preserve or restore equal access to Beloit's educational programs without unreasonably burdening the other party.

48. Examples identified by Beloit's Policy included measures such as counseling, schedule modifications, campus escorts, mutual restrictions on contact, housing modifications, leaves of absence, and increased security.

49. The Policy did not authorize Beloit to use the label "supportive measures" as a substitute for the grievance process where measures imposed upon a respondent were in substance disciplinary or punitive.

50. Beloit's Policy further provided that before disciplinary sanctions or other actions that were not supportive measures were imposed against a respondent, Beloit would follow the grievance process.

51. Wright alleges that the cumulative restrictions imposed upon him, including displacement from his residence, substantial limitations upon where he could go and what he could do on campus, interference with his football participation, and the eventual circumstances preventing him from safely remaining on campus, were substantially burdensome and went beyond measures reasonably necessary merely to preserve equal educational access.

52. To the extent Beloit considered Wright an immediate threat requiring his removal from an educational program or activity, Beloit's Policy separately required an individualized safety and risk analysis, a determination that an immediate threat to physical health or safety arising from the allegations justified removal, and notice and an opportunity to challenge the decision immediately following the removal.

53. The extent to which Beloit conducted or documented the individualized assessments required by its Policy, considered less burdensome alternatives, characterized the restrictions internally, or determined that those restrictions were non-punitive supportive measures remains within Beloit's possession and control and will be further developed through discovery.

**E. Wright's Football Participation Is Restricted**

54. During the same period in which the sexual-misconduct allegation was pending, Wright's participation in Beloit's football program was suspended or otherwise restricted.

55. Beloit has subsequently asserted that the athletic consequence was not punishment for the sexual-misconduct allegation but instead resulted from Coach Soenksen's belief that Wright had changed his account of events and lied to him.

56. According to Beloit's subsequent explanation, the football program maintained a rule against lying and Wright was temporarily suspended for violating that rule.

57. Yet Beloit has subsequently represented in response to a request for Wright's education records that it possesses no responsive disciplinary or athletic records concerning Wright.

  a. The contemporaneous basis for Wright's football suspension, including the alleged statements made by Wright, any documentation of the supposed inconsistencies, the rule allegedly violated, the decision to suspend him, and the treatment of other football players under the same rule, is presently within Beloit's possession or control and will be sought through discovery.

  b. No determination had been made through the Title IX grievance process that Wright engaged in the sexual misconduct alleged against him when his football participation was restricted.

**F. Formal Title IX Complaint**

58. On September 11, 2023, Beloit's Title IX Coordinator issued Wright a Notice of Formal Complaint concerning the September 2 allegations.

59. The Formal Complaint alleged that Wright had engaged in non-consensual sexual assault and misconduct.

60. The issuance of the Formal Complaint invoked the formal grievance procedures contemplated by Beloit's Policy.

61. Wright remained entitled to the presumption that he was not responsible for the allegations unless and until the grievance process resulted in a determination of responsibility.

**G. Beloit Advises Wright's Mother Concerning His Safety**

62. As tensions surrounding the allegations continued, Youngblood communicated with Wright's mother, Renee Bean, concerning Wright's safety.

63. Wright alleges that Youngblood informed Bean that Beloit could not ensure Wright's safety on campus and advised her to remove Wright from the College and return with him to Florida.

64. Faced with the College's representation that it could not ensure her son's safety, Bean traveled to Wisconsin and removed Wright from campus.

65. Wright thereafter returned to Florida with his mother.

66. Wright's departure was prompted by the safety circumstances confronting him and Beloit's representations concerning its inability to protect him.

67. Wright did not understand his departure from campus to constitute a permanent and voluntary surrender of his status as a Beloit student.

68. Wright did not personally request that Beloit permanently terminate his enrollment.

**H. Beloit's Contemporaneous Records Tie Wright's Withdrawal to the Circumstances on Campus**

69. Beloit now maintains that Wright withdrew from the College on September 12, 2023.

70. On September 13, 2023, one day after the date Beloit identifies as Wright's withdrawal date, Beloit's Director of Financial Aid, Betsy Henkel, communicated with Youngblood regarding “Ale'Xavier Wright's withdrawal.”

71. Henkel explained that she and Youngblood had discussed waiving Beloit's ordinary tuition-refund policy because of the circumstances surrounding Wright's departure.

72. College personnel ultimately considered following the ordinary tuition-refund calculation and using emergency grant assistance to cover remaining costs and refund payments already made by Wright's family.

73. Because the College anticipated that use of emergency funds could later be audited, Financial Aid requested documentation explaining why Wright qualified for the extraordinary financial treatment.

74. On September 15, 2023, Financial Aid proposed documenting the justification substantially as follows: Wright had been involved in a sensitive and confidential situation that required him to withdraw immediately.

75. On September 18, 2023, Youngblood responded that Financial Aid's description was "exactly right."

76. Youngblood further explained that the situation had become increasingly mentally and physically stressful for Wright and was inhibiting Wright's ability to remain at Beloit.

77. These contemporaneous communications demonstrate that Beloit's own officials understood Wright's departure and resulting withdrawal status to be directly connected to the circumstances arising from the unresolved allegations and Wright's ability to remain safely and effectively on campus.

78. They do not, however, identify a written or electronic request from Wright voluntarily directing Beloit to terminate his enrollment.

**I. Beloit Uses Wright's Non-Enrollment to Terminate the Title IX Process**

79. On September 18, 2023, approximately one week after issuance of the Formal Complaint, Youngblood issued a Notice of Discretionary Dismissal.

80. The Notice stated:

> "Ale'Xavier Wright (Respondent) is officially not enrolled or employed by Beloit College."

81. Beloit then relied upon Wright's purported non-enrollment to terminate the Title IX proceeding.

82. The Notice explained that Wright's non-enrollment and resulting circumstances prevented Beloit from gathering sufficient evidence to reach a determination and that the Formal Complaint was therefore dismissed.

83. The dismissal was not a determination that Wright committed sexual misconduct.

84. Nor was the dismissal an adjudication exonerating Wright.

85. The allegation was instead left unresolved.

86. Beloit further advised Wright that if he enrolled and returned to Beloit before the complainant graduated or otherwise left the College, the Formal Complaint could be reinstated.

87. Wright was therefore left in the position of having departed campus after the College allegedly advised his mother that it could not ensure his safety, while simultaneously facing reinstatement of the unresolved sexual-assault allegation if he returned.

88. Beloit's Registrar has subsequently confirmed that College records identify September 12, 2023, as Wright's withdrawal date.

89. Wright disputes that he voluntarily requested a permanent withdrawal or communicated an intention permanently to relinquish his enrollment.

90. The presently available records do not identify a withdrawal form, electronic request, written authorization, or other affirmative communication from Wright requesting permanent withdrawal.

91. The documents, communications, database entries, audit history, authorizations, and decision-making processes establishing how Wright came to be recorded as withdrawn on September 12, 2023, and identifying the person or persons who initiated and processed that status change, are within Beloit's possession or control and will be sought through discovery.

**J. Beloit's Subsequent Records Raise Additional Questions Concerning Its Stated Reasons**

92. Beloit has subsequently provided detailed explanations for actions taken against Wright during September 2023, including its contention that his football suspension resulted from dishonesty toward his coach rather than the pending sexual-misconduct allegation.

93. Yet Beloit has also represented that it has no responsive education records concerning Wright's athletic or disciplinary records.

94. At the same time, Beloit has identified records maintained in connection with its Title IX response, including the Formal Complaint, Party Rights information, a No Contact Order, Wright's written statement, an interview transcript, communications involving his parent, and the Notice of Discretionary Dismissal.

95. Discovery will therefore be necessary to determine whether Beloit's stated reasons for the restrictions and consequences imposed upon Wright were contemporaneously

documented and consistently applied or were subsequently developed to explain actions taken before any determination of responsibility.

96. Additionally, on October 3, 2023, weeks after the date Beloit now identifies as Wright's withdrawal, Beloit's Financial Aid Office communicated with Wright concerning the finalization of his Fall 2023 financial-aid information.

97. Wright alleges that the foregoing circumstances, considered collectively, raise substantial questions concerning how his enrollment status was processed, how various College departments understood that status, and whether the College followed the procedures and protections it had promised him.

## V. CLAIMS FOR RELIEF

## COUNT I

### BREACH OF CONTRACT AND DUTY OF GOOD FAITH AND FAIR DEALING
### Against Beloit College

98. Wright incorporates the preceding paragraphs as though fully set forth herein.

99. Wright's enrollment at Beloit College created a contractual relationship between Wright and Beloit.

100. The contractual relationship included the terms, policies, procedures, and commitments governing Wright's status and Beloit's treatment of him as an enrolled student.

101. Beloit's written Policy Against Sexual Harassment and Associated Grievance Procedures formed part of that contractual relationship and established obligations governing Beloit's response to allegations of sexual misconduct against Wright.

102. Wright performed his obligations under the parties' contractual relationship or was excused from further performance.

103. Beloit promised, among other things, that Wright would be presumed not responsible for alleged sexual misconduct unless and until responsibility was established through the grievance process.

104. Beloit promised that supportive measures imposed while allegations remained unresolved would be non-disciplinary and non-punitive and would be designed to preserve or restore equal access to Beloit's educational program without unreasonably burdening the other party.

105. Beloit further promised that disciplinary sanctions or other measures that were not supportive measures would not be imposed against Wright without first following the grievance process provided by its Policy.

106. To the extent Beloit sought to remove Wright from educational programs or activities because it considered him an immediate threat arising from the allegations, its Policy imposed additional procedural requirements governing emergency removal.

107. Beloit further owed Wright the duty of good faith and fair dealing inherent in the parties' contractual relationship.

108. Beloit breached its contractual obligations and/or the duty of good faith and fair dealing by, among other things:

a. imposing or facilitating restrictions upon Wright before any determination of responsibility that were disciplinary, punitive, and/or unreasonably burdensome rather than permissible supportive measures;

b. substantially restricting Wright's movement and participation in campus life while he remained presumptively not responsible;

c. interfering with or permitting interference with Wright's participation in the football program before any Title IX determination of responsibility;

d. failing to preserve Wright's meaningful and safe access to Beloit's educational program while the allegations remained unresolved;

e. creating or permitting circumstances under which Wright's continued physical presence on campus became increasingly mentally and physically stressful and, according to Wright, advising his mother that Beloit could not ensure his safety;

f. thereafter treating Wright's safety-related departure as a withdrawal or termination of enrollment despite Wright's lack of intent voluntarily and permanently to relinquish his enrollment;

g. relying upon the resulting non-enrollment to terminate the grievance process before reaching a determination regarding responsibility; and

h. leaving Wright subject to reinstatement of the unresolved sexual-misconduct proceeding if he returned to the College.

109. Beloit's contemporaneous acknowledgment that the circumstances “required” Wright to withdraw immediately and were inhibiting his ability to remain at Beloit supports Wright's allegation that his departure was not an ordinary voluntary withdrawal independent of Beloit's handling of the pending allegations.

110. As a direct and proximate result of Beloit's breaches, Wright lost the benefit of the educational relationship and procedural protections for which he had contracted.

111. Wright further suffered loss of educational and athletic opportunities, financial losses, reputational injury, and other compensable damages in an amount to be determined at trial.

**COUNT II**

**TITLE IX — SEX DISCRIMINATION**
**20 U.S.C. § 1681 et seq.**
**Against Beloit College**

112. Wright incorporates the preceding paragraphs as though fully set forth herein.

113. Beloit College receives federal financial assistance and is subject to Title IX.

114. Title IX prohibits Beloit from excluding a person from participation in, denying a person the benefits of, or subjecting a person to discrimination under its educational programs or activities on the basis of sex.

115. Wright was a male student accused by a female student of sexual misconduct.

116. Wright was entitled under Beloit's own Title IX procedures to a presumption that he was not responsible unless and until the grievance process resulted in a determination of responsibility.

117. No such determination was ever made.

118. Nevertheless, almost immediately following the allegation, Wright experienced substantial adverse consequences affecting the principal components of his college experience.

119. Wright was displaced from his existing campus housing.

120. Wright was instructed to substantially restrict his movement and activities to class, his residence, and meals.

121. Wright's participation in Beloit's football program was suspended or restricted.

122. Wright alleges that these restrictions materially affected his ability to participate fully in Beloit's educational and athletic programs before any determination that he engaged in misconduct.

123. Beloit's own Title IX Policy provided that interim supportive measures were to be non-disciplinary and non-punitive and designed to preserve or restore equal educational access without unreasonably burdening the other party.

124. Wright alleges that the cumulative restrictions and consequences imposed upon him were punitive and/or unreasonably burdensome in operation and deprived him of meaningful access to significant aspects of the College experience while he remained presumptively not responsible.

125. Wright further alleges that Beloit's handling of the allegation ultimately contributed to circumstances in which he could no longer safely and effectively remain on campus.

126. Beloit's contemporaneous internal communications support the connection between the pending situation and Wright's departure: College officials described the sensitive and confidential circumstances as having "required" Wright to withdraw immediately, and Youngblood agreed that this characterization was "exactly right."

127. Beloit thereafter relied upon Wright's resulting non-enrollment to terminate the grievance proceeding without adjudicating the allegation.

128. During the relevant period, the female complainant remained enrolled and able to continue participating in Beloit's educational programs, while Wright, the male respondent, was subjected to the restrictions and consequences described above and ultimately denied continued participation in Beloit's educational and athletic programs, despite the absence of any determination that he had engaged in sexual misconduct.

129. Considering the totality of the circumstances, including that Wright was the male respondent to a female student's accusation, that the substantial restrictions and consequences described above were imposed upon him before any determination of responsibility, and that the female complainant was not subjected to comparable restrictions during the relevant period, Wright alleges that Beloit's treatment of him was affected by sex and by gender-based assumptions concerning male students accused of sexual misconduct.

130. Records and information bearing upon whether sex influenced Beloit's decisions, including communications among College officials, Title IX training materials, records concerning the reasons for and characterization of the restrictions imposed upon Wright, and records concerning Beloit's treatment of similarly situated male and female students, to the extent such records exist, are primarily within Beloit's possession and control.

131. Discovery will include evidence concerning whether comparable restrictions or consequences were imposed upon complainants or respondents of a different sex under materially similar circumstances and whether Beloit consistently applied its stated policies without regard to sex.

132. As a direct and proximate result of Beloit's alleged sex discrimination, Wright suffered exclusion from and loss of educational and athletic opportunities, financial loss, reputational injury, and other compensable damages.

## VI. DAMAGES

133. As a direct and proximate result of Beloit's conduct, Wright has suffered damages including disruption and loss of his Beloit education, loss of educational opportunities, loss of athletic opportunities, financial losses associated with the termination of his Beloit education, reputational injury to the extent legally compensable, and other compensable injuries.

134. Wright entered Beloit with an Eaton Scholarship valued at $37,000 annually and $148,000 over four years, subject to the applicable terms and conditions of the award.

135. Wright's damages include the value of educational and financial opportunities lost as a legally compensable consequence of Defendant's conduct, subject to proof of causation, mitigation, and the applicable measure of damages.

136. Wright will establish the nature and amount of his damages through discovery and at trial.

## VII. RELIEF REQUESTED

WHEREFORE, Plaintiff Ale'Xavier Wright respectfully requests judgment in his favor and against Defendant Beloit College as follows:

A. Compensatory damages, including damages for economic loss, loss of educational and athletic opportunities, reputational injury to the extent legally compensable, and all other compensable injuries, in an amount to be determined at trial;

B. Appropriate equitable and injunctive relief concerning Wright's educational, enrollment, athletic, and disciplinary records;

C. Prejudgment and post-judgment interest as permitted by law;

D. Reasonable attorneys' fees and costs to the extent authorized by applicable law; and

E. Such other and further relief as the Court deems just and equitable.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

Date: 2 September 2026,

/s/ Corey L. Saffold

Corey L. Saffold
Wisconsin Bar No. 1136889
Laster & Associates, LLC
839 N. Jefferson St., Suite 310
Milwaukee, WI 53202
(414) 431-1195-Tel
cls@lasterlaw.com

*Counsel for Ale'Xavier Wright*